MUNRO v. BRADSTREET CO.   (No. 7821.)

(Supreme Court, Appellate Division, First Department.   November 19, 1915.)

MERCANTILE AGENCIES ☞3—ERRONEOUS RATINGS—LIABILITY.

Plaintiff, a subscriber to a commercial agency, requested a rating on a prospective customer. The rating was furnished by telegram. Defendant agency representing that it had made a special investigation and found that credit might safely be extended the customer. After the goods were sold, it appeared that the purchaser was in fact insolvent. The contract between plaintiff and defendant provided that defendant should not be liable for any loss or injury caused by neglect or other act of defendant, or any of its officers, agents, or employés, in procuring, collecting, and communicating information. *Held*, that the contract, while relieving the defendant from error and mistake, would not relieve it from gross mistakes and negligence by which reports, wholly false with reference to the action taken by it upon a subscriber's request, were made when defendant knew that the subscriber desired the information to enable him to extend credit.

[Ed. Note.—For other cases, see Mercantile Agencies, Cent. Dig. § 3; Dec. Dig. ☞3.]

Ingraham, P. J., and Clarke, J., dissenting.

Appeal from Trial Term, New York County.

Action by Alexander J. Munro against the Bradstreet Company. From a judgment dismissing the complaint, plaintiff appeals. Reversed, and new trial granted.

Argued before INGRAHAM, P. J., and LAUGHLIN, CLARKE, SCOTT, and DOWLING, JJ.

William D. McNulty, of New York City, for appellant.

George F. Canfield, of New York City (Arthur B. Smith, of New York City, on the brief), for respondent.

LAUGHLIN, J.   On April 30, 1913, the plaintiff, who resided in Chicago, Ill., became a subscriber to the defendant's commercial agency for the period from May 1, 1913, to June 30th of the following year. In consideration of the payment of $100, the contract entitled the plaintiff to the use of the books of ratings to be issued by the defendant in July, 1913, and January, 1914, and obligated it to furnish to him not to exceed 100 reports with respect to ratings of merchants and others doing business within the territory embraced in the contract, which included the city of New York, and provided that such reports were to be based on "information of record in its offices or obtained within" the period covered thereby.

The defendant had obtained a statement in writing from Jackson & Sulzer, a firm doing business at 27 West Twenty-Sixth street, New York City, as furriers, on February 8, 1913, which showed that their assets exceeded their liabilities by $15,064.53; and the defendant's book, presumably the issue of July, 1913, although that fact is not clearly proved, showed that Jackson & Sulzer had a rating of from $10,000 to $20,000, second grade of credit. Prior to August 28, 1913, the plaintiff had had no dealings with this firm. Negotiations were

opened between one O'Neill, his agent in New York City, and Jackson & Sulzer, for the sale to them by the plaintiff of 450 dyed black fox pelts. The firm offered $1,650; and on the morning of August 28, 1913, O'Neill wired the plaintiff of the offer. The plaintiff then looked at the firm's rating in the defendant's book, and, not being satisfied with it, telephoned to defendant's office in Chicago and asked one Brady, who answered the telephone, for a report on the firm, and was informed that the defendant had no report on file in its Chicago office, but that if the plaintiff would pay the expense of a telegram they would wire New York "to get an investigation" of the firm. The plaintiff was called up on the telephone later the same day by defendant's Chicago office, and informed that they had received a telegraphic report on the firm and that "their man" had called on them. At his request the report, which purported to show their assets and liabilities, was read to him over the telephone, and he was informed that a representative of defendant had called on the firm and received this information, and was, in effect, assured that their credit was good for the purchase price of the pelts. The defendant's Chicago office sent plaintiff a copy of the telegraphic report pursuant to his request, and he received it the next morning. It was as follows:

190–8–28–13                     Telegram
        Jackson & Sulzer—Furs—New York City, N. Y.
   We learn to-day by telegraph as follows:
   They state in substance as follows: "Assets, $58,500.00; liabilities, $43,500.00."
   Statement is corroborated by the trade, they are doing a fair and deemed safe business, are well regarded and deemed worth of credit, and pay promptly so far as known here.
                              .............. Aug. 29, 1913.

He then wired O'Neill to close the contract, and the goods were sold to the firm on credit on August 29, 1913. After first telephoning to defendant's Chicago office, and the same day or the following morning, the plaintiff filled out a form or ticket furnished by defendant calling for a general report by wire, and stating that a detailed report might follow, with respect to the firm. It does not appear that anything was said with respect to this in the telephonic conversation. About two or three weeks later, defendant mailed a detailed report to the plaintiff, including a copy of the firm's statement of February 8, 1913. The credit given was one-half for five months and one-half for six months, and on September 30, 1913, defendant telephoned to the plaintiff a report, evidently received from New York, that bankruptcy proceedings against the firm had been commenced by its creditors, and it mailed a copy thereof to him.

This action is brought on the theory that the defendant was guilty of a breach of its contract by gross negligence, amounting, in effect, to fraud, in representing that it had obtained a special report on August 28, 1913, with respect to the firm's financial condition; whereas, as was alleged and shown, the defendant had at that time no information excepting the original statement of February 8, 1913, which was shortly after the firm commenced business. The evidence was uncontroverted that the defendant made no special investigation or inquiry

in August, pursuant to the plaintiff's application. The plaintiff had applied for and obtained about 30 reports on other merchants before, but had not asked for any special investigation or report by telegraph. It would seem from the testimony of defendant's reporter in the New York office that the books are revised every six months, and that in the meantime, when application is made for special information, a ticket is given to him and he makes inquiries and reports. He testified that he did not receive any ticket or make any inquiries or report with respect to this firm between March and September, 1913. The plaintiff also attempted to show the financial condition of the firm at the time in question, and the information given by the firm to another agency shortly before, to show that the firm was, in effect, insolvent at that time; but that evidence was all excluded.

The defendant claims that it is relieved from liability by virtue of provisions of the contract as follows:

"That the said company shall not be liable for any loss or injury caused by the neglect or other act of said company or any of its officers, agents, or employés, in procuring, collecting, and communicating said information."

Both parties rely upon Xiques v. Bradstreet Co., 70 Hun, 334, 24 N. Y. Supp. 48, affirmed on opinion below 141 N. Y. 605, 36 N. E. 740, in which it was stated, under a contract similar, excepting that it was confined to the acts of the employés and officers, and did not embrace the acts of the agency itself, as does the contract in the case at bar, that these provisions relieved the agency from liability, except for gross negligence amounting to fraud.

I am of opinion that the plaintiff presented a case for the consideration of the jury. The defendant neither made nor attempted to make any explanation concerning its false representations to the plaintiff. On the evidence adduced in behalf of the plaintiff, the jury would have been justified in finding gross negligence on the part of the defendant, by which the plaintiff was misled to his loss in giving credit to an insolvent firm. The defendant has so drafted the contract that it is relieved from liability for any loss or injury caused by "neglect" or "other act" in "procuring, collecting, and communicating" information to its subscribers. The contract must be given a construction which will entitle the plaintiff and other subscribers to receive something for the large annual payments they are induced to make to defendant in expectation of receiving financial information with respect to those with whom they deal, which will be of some assistance to them in determining whether or not to extend credit. Of course, it was competent for the plaintiff to make a present of the money to defendant, if that is what was intended; but manifestly it is not.

Such contracts are rightly construed strictly against the party who prepares them. A reasonable construction, I think, merely relieves the defendant from errors and mistakes, but not from knowingly making false reports, or from gross mistakes or negligence by which reports, which are wholly false with respect to the action taken by the defendant on a request by a subscriber for a report as to the financial standing of a merchant, are made when it is known that he desires the information to enable him to determine whether to extend credit on a

particular sale. The evidence would justify a finding of gross negligence, and also that defendant was guilty of constructive fraud in thus misrepresenting the financial credit of the firm to the plaintiff, thereby leading, if not inducing, him to extend the credit.

It follows that the judgment should be reversed, and a new trial granted, with costs to appellant to abide the event. Order filed.

SCOTT and DOWLING, JJ., concur.

INGRAHAM, P. J. (dissenting). I dissent from the reversal of this judgment. The plaintiff, residing in Chicago, Ill., became a subscriber to the defendant's system. He paid to the defendant $100 a year in consideration of its supplying not to exceed 100 reports concerning the responsibility, etc., of merchants, manufacturers, or bankers, or other mercantile persons transacting business, and the plaintiff was also to have the use of a certain edition of defendant's printed volumes, and agreed to pay 50 cents on demand for each report in excess of this number. And it was then agreed between the plaintiff and the defendant:

"That the said company [the defendant] shall not be liable for any loss or injury caused by the neglect or other act of said company, or any of its officers, agents, or employés, in procuring, collecting, and communicating said information. That the said company does not guarantee the correctness of the aforesaid information, whether printed, written, or verbal. * * * That the conditions of this subscription, as set forth above, embody all the agreements and understandings concerning it made or had with said company, or its agents or employés acting in its behalf, either verbal or written, and that the power to modify, alter, amend, release, or cancel this subscription, or any portion or condition thereof, after being signed, rests solely in the president of the Bradstreet Company, and if any change is made it must be duly authorized by him in writing."

This subscription was for a term beginning May 1, 1913, and ending June 30, 1914. The parties, being able to contract, made this contract, and I can see no reason why it should not be enforced. By it the plaintiff agreed that the company should not be liable for any loss or injury caused by the neglect or other act of the said company, or any of its officers, agents, or employés, in procuring, collecting, and communicating said information. That being the contract, on August 27 or 28, 1913, the plaintiff in Chicago called up the agency of the Bradstreet Company in Chicago and asked him for a telegraphic report about the firm of Jackson & Sulzer, doing business in the city of New York; plaintiff having an offer to buy certain furs by that firm on credit. Defendant's agent in Chicago said they had no report as to that firm on their files, but he would wire to get a report on Jackson & Sulzer the following day. On the following day defendant's agent called plaintiff up, said that they had received a telegraphic report on Jackson & Sulzer, and that their man had called on him. Then plaintiff asked defendant's agent to read the report, and defendant's agent read the report over the telephone. Plaintiff then asked the agent to mail him a copy of the report, and plaintiff subsequently received a

copy of the telegram, dated August 29, 1913, which stated that Jackson & Sulzer—

"state in substance as follows: 'Assets, $58,500; liabilities, $43,500.' Statement is corroborated by the trade, they are doing a fair and deemed safe business, are well regarded and deemed worthy of credit, and pay promptly so far as known here."

On that report there was printed a statement that:

"The correctness of this report is not guaranteed, but having been obtained by us in good faith—from authorities deemed reliable—it is transmitted to' you in strict confidence for your exclusive use and benefit, and in accordance with the terms of your subscription agreement."

Acting upon this information the plaintiff accepted the offer of Jackson & Sulzer and sold the goods, but before the notes received by them in payment became due Jackson & Sulzer became bankrupt. The court below dismissed the complaint, and I think properly. Plaintiff knew perfectly well that it was asking information from the Chicago agency of the defendant, which had no information on file and would therefore involve a telegraphic communication with New York, and a report also by telegram. Before making the sale, plaintiff had received a copy of the telegram from New York. Plaintiff knew that the defendant's agent in Chicago had no knowledge, except what was obtained in this telegram, and, as before stated, the telegram itself was communicated to the plaintiff. I do not find that here there was a misrepresentation. It appeared by the evidence that defendant had received from Jackson & Sulzer information of their condition as specified in this telegram as of January 20, 1913, and that Jackson & Sulzer's condition had been confirmed by investigations made in March.

The only mistake that was made was in not stating in the telegram that this was a statement of March, instead of one at the time the communication was furnished. There was no false statement, and no misrepresentation. Defendant's agent in Chicago had said that defendant's man had called on Jackson & Sulzer; and that was true, although the call was in the previous March, and not in August. It seems to me that the inaccuracy of this report, if it can be so designated, was caused by the telegraphic communication to Chicago from New York, by which the plaintiff assumed that this was an independent investigation made at the time of the report, and not one based upon the documents in the defendant's office. I think that at most this was the neglect or other act of said company or its officers, agents, or employés, in procuring, collecting, and communicating said information, and for that the plaintiff had expressly agreed that the defendant should not be liable. If the plaintiff had desired further information, it could have asked for the date of the report made about Jackson & Sulzer. There was certainly nothing in the statement issued by the company, and upon which the plaintiff acted, that would justify a finding of fraud.

In the prevailing opinion stress is laid upon an observation of Judge Follett in writing the opinion of the court in Xiques v. Bradstreet Company, 70 Hun, 334, 24 N. Y. Supp. 48, affirmed on opinion below 141 N. Y. 605, 36 N. E. 740. That action was against this defendant

for liability for making a false report as to the responsibility of a merchant with whom the plaintiff had dealings, and it appeared in that case that the report was entirely misleading. In discussing the case Judge Follett, writing the opinion at General Term, said:

"Under this stipulation the defendant cannot be held liable for the consequences of misinformation, unless it is so grossly negligent in acquiring or communicating it that its conduct in effect amounts to a fraud."

And then, on examination of the case, he held that the defendant was not liable. It is a little difficult to understand what the learned court had in mind when speaking of such negligence "as in effect amounts to a fraud." But I think at least to bring a communication made by the defendant to one of its subscribers within this definition there must be some of the elements of fraud, such as intentional communication of false information, or of evidence—of which there was none in this case—from which it can be inferred that the defendant through one of its responsible officers intended to deceive, nor a more insufficient report, which, although it conveyed false information, was based upon the mistake of the defendant's agents, with no suspicion of any intent to deceive. Here, as before stated, plaintiff knew that the defendant would have to obtain the information by telegram from New York. The telegram itself was communicated to the plaintiff, and the plaintiff was expressly told that the defendant had no information at its Chicago office. There certainly was no evidence that could possibly justify a finding of any intention to deceive, or anything more than neglect of either the New York agent or the Chicago agent, and for such neglect the plaintiff expressly agreed that the defendant should not be liable. It also was expressly guaranteed that this agreement should not be modified, except by the president of the defendant company, and it is not claimed that any communication was made to or received from him. I think, therefore, the defendant was misled· by a false impression which he obtained from this telegram, which at most was the neglect of the agents of the defendant, either in New York or Chicago, for which the defendant was not liable.

I think, therefore, that the judgment should be affirmed.

CLARKE, J., concurs.